Good morning. I'm James Laughlin and I represent the appellant David Bachtel. With the court's permission, I'd like to reserve three minutes of my time for rebuttal. This case involves multiple acts of prosecutorial misconduct at Mr. Bachtel's trial. Today I'd like to focus on two issues, that the misconduct was intentional and that it was not harmless. The first point is important because, as this court noted in Kojean, it must consider the government's willfulness in committing misconduct and its willingness to own up to it. And we're not just talking about the particular prosecutor at trial, whether he owned up to misconduct, but whether the government on appeal has owned up to it. I have a couple of problems with your theory. Let me tell you what they are so you can educate me out of them. One is, once the government approves the fake documents for the sale to some made-up Mexican name, it looks like Jose Lopez or something, it looks like you're dead in the water. And so any error is harmless. And the second thing is, on the vouching, which was troublesome, it looked like the district court took care of it, and took care of it fully and adequately with its admonition and instruction. And besides that, it really didn't look like much. Okay, we'll first deal with Your Honor's comment about the false statement. I don't think that it's... The document. Right, the false statement on the document. I don't think that what's in the record, absent these three critical witnesses, Willingham, Case, and Daley, enough to say that that was even a false statement. And so it would only be as to that one count, but I'll explain why you did that one count. I don't think it's sufficient proof. And that's because the defense theory was that these three other people, and perhaps others, were conspiring to set him up by getting his boat and then sinking it in a deliberately intentional way, in a way that it would be found, and he'd be blamed for it. So in that context, the possibility that these men got some Latino gentleman to come by the boat and then put down false information on the form that Mr. Bochtel eventually filed. You're saying if you could prove the three witnesses were liars, then maybe the statement wouldn't be obviously fake. What I'm saying is... By the statement, I mean the document wouldn't be obviously fake. Correct, Your Honor. What I'm saying is that the entire case comes down to this group of people who is pointing the finger at Mr. Bochtel. And I think when the court looks at it closely, it will realize that that testimony is far from overwhelming. But before I go on to that, I'm sorry, Your Honor, I forgot your second question. Bouching. The bouching. It looked like the judge took care of it with an admonition and instruction. Judge Sexton did an admirable job in stepping in and giving that instruction. I think it doesn't solve the problem completely for a few reasons. First, and most obviously, we've alleged several different kinds of misconduct, and that instruction only went to this one type of misconduct. So it has nothing to do with the other misconduct throughout the trial. The second point is that we would argue that given the boldness of the vouching that was made, that this is a case where that bell can't be unrung by this kind of jury instruction. It was just too repeated and too emphasized by the prosecutor to be able to fully neutralize it. I would have thought the bell was unrung just because everybody at the marina seemed kind of trashy. I can't dispute with that characterization, Your Honor. We only had a lot of, well, at least we won't call them character witnesses. Yes, these were certainly characters. But there was quite a bit of physical evidence about your client removing stuff from the boat and probably being involved in filling the tank with water and maybe drilling some holes. That's true, Your Honor, but it all comes from these same three witnesses. The physical evidence did. It was consistent with the testimony of those witnesses. Which it would be if they're the ones who got the boat, sunk it in a deliberate manner, and then blamed Mr. Bicot. I thought the Coast Guard pulled it up and looked at the hole, and there were holes not of the sort you make with a rock but the sort you make with a drill, need holes. Or a pick, as they say. Not a drill, but a pick. Yes, it's all true, and that all matches the story that these three supposed eyewitnesses told about seeing Mr. Perkowski and Mr. Bicot with a pick. Well, the fact that the bad witnesses are corroborated by the physical evidence in the Coast Guard doesn't mean that you disregard the physical evidence in the Coast Guard. It means maybe the bad witnesses, even if they might be liars generally, aren't lying this time. Yes, but I would put it a different way. I would say that they are lying consistently with the situations they themselves set up. How do you deal with the holes in the boat? You're saying they put the holes in the boat? Yes. Yes, and the defense theory of trial was that these people had a grudge against the management at the marina, which goes from the Rollins Brothers Saloon down to the dockmaster, Bill Samuels, and down to Mr. Boctel. And they concocted this scheme when he was selling his boat, because he was getting rid of it, to get the boat, sink it in a way, and not only in a way that looks deliberate, but in a way that's certain to be found. Why would his enemies sink his boat if what he wanted in the first place was to get rid of his boat? Sink his boat and make it look like he did that so that he did end up getting prosecuted. And I think what's significant here, when we start talking about- Can I ask you, so your theory is that they did all of this without anyone seeing any of them in the vicinity of the boat dock at that time? Yes. Well, the statements that Mr. Boctel made to law enforcement pre-trial, which came in, he told them that the Latino man who bought the boat took it from him, and he saw him take it away. But doesn't the fact that there was questionable registration of the boat to the Latino man undercut the conspiracy theory? I don't- How does that fit in with the conspiracy that there was a false title filed? How does that fit with the conspiracy that they were setting him up? Who would have done that? How would that fit in? Well, I think that the theory would be that these people obviously couldn't buy the boat from Mr. Boctel directly and then follow through on their plan to sink it and blame him for it. So what they would have to do is get an intermediary- So they got the Hispanic man to- Who put down a false name and address, and when he filled out the DMV form, and then he took the boat away, the conspirators at some point got it, sunk it, and again, in a way that not only is it obvious it was sunk intentionally, it was obvious it was intended to be found. How does that square with the untruth about the two men not being in contact, Mr. Boctel and his friend, saying that they had not contacted each other, and then these telephone records came up where they were, in fact, in communication in the late hour of the evening? How does that fit with the conspiracy theory? I think Mr. Perkowski explained that. First of all, the phone records only show that calls were made from Mr. Boctel's phone to Mr. Perkowski's phone. Mr. Boctel's live-in girlfriend, Judy England, and Mr. Perkowski's wife were also friends, and so he really couldn't remember being on any phone calls that night, and he certainly knows he wasn't on anything involving this. This all sounds like stuff for the jury or for the judge, if it's tried to a judge. I don't remember. I think it was jury. Jury. On the one hand, you've got people who say they heard him say that he planned to sink the boat, and they saw him sink the boat. On the other hand, you put on evidence that they have grudges against Boctel, and they're pretty trashy people, so they shouldn't be believed, and that's just what juries do for a living is decide that kind of thing. What I care about is whether there's judicial error that requires reversal, and that's what I'm having trouble with. Okay, and hopefully I can answer that question because I think that despite what Judge Tagasugi found and despite what the government claims on appeal, this wasn't a close case. This wasn't an overwhelming case. You're certainly right that these are matters best left to the jury, and there's a lot going on out there, and the jury could have looked at the case one way or it could have looked at it a different way. What we're saying is that it's close enough where the misconduct made a difference, and I think there's three things that kind of highlight that. The length of the jury deliberations, which were six or seven hours. The fact that after four hours. That's not especially long. I mean, it's not like when the jury's back before you have time to go to the restroom, which occasionally happens, but one day's deliberation is not unusual. It's not that long, but it's longer than one would expect when the government is saying it's a simple case, it's an overwhelming case, and when you factor in that four hours into those deliberations that came back with a note saying we might be deadlocked, that reflects the jury as looking at this as a slam dunk for the government. Did they come back twice or once? With the deadlock question? Yeah. Only once, but they asked some other questions later on, but only once. But they did come back twice. Yes, and actually the later questions are also pertinent on this point. That's about 403. Yeah, that's about 403. What's a 403 objection? I think that's significant because some of the misconduct that occurred during the trial, the defense counsel was forced to stand up and say, Your Honor, objection 403, and clearly that must have had some kind of influence on the jury if during deliberations they're asking, well, what does that mean? And, of course, they were instructed they shouldn't. And, of course, the answer is it's none of their business. But it reflects that this misconduct. You know, you keep saying misconduct, but a lot of it I couldn't even see that it was misconduct. For example, you get a statement, Chet Perkowski, I think he came in here and lied to you, frankly. The government submits it, he gave false testimony. I'll explain it to you why. And that's just typical of the things where you characterize it as misconduct. I'm not so sure it is. The prosecutor doesn't say, I know that he lied to you. He doesn't do anything in the nature of vouching or reverse vouching, implying he has special knowledge. He's just saying what he thinks based on the evidence that's been put before the jury. And when he did vouch improperly, the judge admonished and the prosecutor immediately apologized for it. It just looked like an ordinary argument about credibility. Well, I think that you can't separate the comments made about the defense witnesses from the comments made in the general vouching issue. Because what the government did was saying, it basically separated witnesses into two groups, government witnesses and defense witnesses. And he says, I can't vouch for defense witnesses. I can vouch, implyingly saying, I can vouch for government witnesses. Well, that was the improper vouching, which was immediately the subject of admonition and apology. Right. But I think that when you take that into account. But he's allowed, he's got, in fact, it's his duty to tell the jury what he thinks the evidence establishes. Give the jury a view of the evidence advocating for his side of the case. I don't understand what else he can do. Well, I agree. It is his obligation to do that. But this court and others have set certain rules. And one of those rules is you can't say, I think he lied. You can say, I submit that. You can't say, I think he lied. You can't say, I know he lied. You can't imply that you have knowledge from outside the evidence presented to the jury. But you can render an opinion about what's believable. Well, I would argue that in the context of this case, particularly when looked at in light of the earlier vouching, the I think becomes an I know. It's problematic because it looks like the prosecutor is weighing in and he's not supposed to. But that's, you know, it's really difficult as a prosecutor to, I mean, when you say I think, you really should say the government submits. So it's kind of a slip of the tongue. You know, Your Honor, I mean, Your Honor raises a good point. If this were the only thing we were here about, let's say I wouldn't be here. And a lot of these things that's looked at individually might be dismissed as innocent states. It might be dismissed as harmless. But we have a real pattern here. And I think the pattern is important because, one, it shows that the acts were intentional. And, therefore, I don't think when something like this comes up, we can dismiss it as an innocent slip of the tongue. Ordinarily, I think we give prosecutors the benefit of the doubt that, you know, their words don't have the most egregious meaning when it's ambiguous. But here I don't think we can give the prosecutor that assumption just because of all the other kinds of misconduct, some of which were, as I pointed out, blatantly unintentional, and some of which the government hasn't explained about why there was legitimate reason to ask those questions. I'm way over time, so I'd like to reserve the rest of my time for questions. Thank you, Your Honor. Thank you. Counsel? May it please the Court, Dorothy Kim on behalf of the government. Your Honors, where a defendant alleges prosecutorial misconduct, there are two questions. First, was there misconduct? And, secondly, if so, did it so affect the jury's ability to judge the evidence fairly such that a new trial is appropriate? In this case, Your Honor, the government concedes the first point. There was misconduct. And, therefore, the only issue on appeal is whether the district court, Judge Takasugi, abused its discretion in finding that a new trial was not warranted. Your Honor, the government submits that this court should defer to the district court's finding. First, the district court delivered a curative instruction that was both immediate and specific. Could you help me on a couple of specifics to confirm? Yes, Your Honor. Just what was the evidence that the defendant created a fake document showing that he'd sold the boat to Jose Lopez or Juan Lopez or something? Yes, Your Honor. And, second, just what was the evidence regarding the holes in the boat? The reason I'm asking these things is that it bears on whether the cure was effective. If you figure the jury went back to the jury room and thought, well, all a bunch of liars, and the government's trying to get us to believe these meth heads and whatnot. But what do they have that isn't dependent on those kind of people? Yes, Your Honor, because the district court, in denying the new trial motion, did discuss the fact that the evidence was overwhelming and suggested the defendant had faked this document. Now, be concrete. Yes, Your Honor. Show me what the evidence was about the document showing a sale to Jose or Juan Lopez, and what the evidence was on the holes. As to the document, Your Honor, the document was actually a release of liability that was submitted to the DMV. On March 6th, the morning where the Coast Guard found the vessel, a Coast Guard officer interviewed the defendant. And he said at that point that he had sold the vessel to two Mexican men. He did not at that point mention the DMV. Your Honor, and at that point, the defendant stated that he believed that this person, Lopez, had removed the boat to Alamitos Bay to salvage the engines. The evidence at trial suggested that the boat was dilapidated and the engines were useless because the defendant had tried to give away the engines for free, and one of the witnesses testified he didn't want it because it was useless. Later, on April 15th, the defendant was interviewed by a special agent of the Coast Guard. At that point, he stated that two men had come, taken the boat, and that they stated they would shoot pornography on it. And he also stated that he watched as they took the boat in a small skiff. He then said that he had delivered a release of liability to the DMV. See, there was a release of liability, Your Honor, and it was dated March 1st of 2005. But, and this was stipulated to by the parties at trial, that DMV release of liability was not received by the DMV until March 16th. At least it was not logged in until March 16th. We don't know when it was received. Yes, Your Honor, and the evidence on when it was received was, if you credit the defendant's version of the facts, it was that Chet Perkowski, who the government submits sunk defendant's vessel with him, Chet Perkowski testified that he had brought it to the DMV. And then there was a break over the weekend, whereupon the government submits he realized that it was a Sunday when he allegedly brought it to the DMV. And he came back, and whereas originally he said, I hand-delivered it to the DMV, after a break in the testimony, he said they were closed, I slipped it in between a gap in the doorway. That's not necessarily inconsistent if you say you hand-delivered it, but a bit ambiguous, Your Honor. Okay, and what do we have to show that the two Mexicans' names, or one Mexican's name on this piece of paper that was slipped in a door at the DMV were imaginary? Your Honor, the defendant's statement to the case agent, or excuse me, the Coast Guard agent, was that he had been approached by someone he said was a Mexican man at the time that he was moving his belongings. I understand first they wanted to salvage the engine, and then they wanted to shoot 30 movies. Is there more? Excuse me, Your Honor? Is there more to show that the Mexicans are imaginary? Yes, Your Honor. There were witnesses at trial who said, I helped the defendant move his belongings, and I did not see a Mexican man. That was countered by Prokowski's testimony that he did see Latino-looking men, but Prokowski also admitted that he'd never seen these men come and take the boat away. In addition, the address on the release of liability form did not exist. So the fake address, it was a fake address? Yes, Your Honor. And one of the witnesses at trial, Greg Daly, who said, I personally helped him move his belongings. I did not see any Mexican men approach him. And then Kevin Willingham said, I observed others helping the defendant move his belongings from one boat to the other, and I, too, did not see any Mexican men. Does that remember there was something about a girlfriend or former girlfriend, something to do with the release of liability form? Yes, Your Honor. The release of liability form had two signatures on it, both David Bakhtel's and Judy England, who was David Bakhtel's common-law wife. And during trial, Prokowski testified that he knew both of their signatures and that he authenticated them as being theirs. In addition, Your Honor, there was a stipulation that the signatures on the release of liability belonged to the defendant and Judy England. As to the Court's question regarding the evidence of the holes, there were two witnesses at trial who testified to actually seeing the defendant and Chuck Prokowski punch holes into the bottom of the vessel, place, drill a cover over the opening to the cabin area, push out the vessel with the skiff, and watch as it sunk. Now, which were those two witnesses? The two witnesses were Kevin Willingham and then the defendant's witness, James Michael Case. And Mr. Case testified that he had actually videotaped the settling. And, Your Honor, the videotape is admittedly not clear. I have watched it numerous times, and it is not clear. But if you review the transcript, what happens is the government plays the videotape over and over again, and it appears that Mr. Case is explaining what it is that's on the videotape. Why was the defense calling him as a witness? Your Honor, what did they expect him to testify to? I'm not sure what they expected him to testify to, Your Honor, but it was clear that the defense intended to impeach Mr. Case. And their theory seems to be the government's case is made up of a bunch of liars. Here's another liar that we're going to present to you. I guess they could have called him to ask something that they thought would be outside the scope of the prosecution's direct, or they could have called him to get him to tell a provable lie. You couldn't tell. It's hard to tell, Your Honor. What did happen, though, is as soon as the defense called Mr. Case, they did introduce the videotape. They had earlier objected to the introduction of the videotape. But when Mr. Case took the stand, they immediately introduced the evidence. You're saying the defense did? Yes, Your Honor. And one of the defendant's arguments on appeal is that the videotape suggests that the government acted intentionally in making its misstatements. But as we submit in our briefs, their theory of prejudice is unclear, given that it was the defense who actually played the videotape. And, Your Honors, in addition, the fact that the prosecutor, when it came to the prosecutor's attention that he had vouched, went beyond the district court's curative instruction and apologized at length, not only for the indirect vouching that the district court had admonished him he should not do. That form of vouching, again, Your Honors, was, I cannot vouch for the defense witnesses. And that witness that the prosecutor was talking about was James Case. One related issue is, Your Honor, Mr. Case actually testified consistent with the government's theory of the case. And, therefore, the prejudicial result from the prosecutor saying you can't believe Mr. Case was mild, given that that defense witness actually supported the government's theory of the case. But after the district court delivered a curative instruction that said the prosecutor, by implication, suggested he could vouch for his own witnesses and he can't do that, the prosecutor, given the first opportunity on rebuttal, said, I apologize. As the court said, I can't do that. Then the prosecutor went further and said, furthermore, any time I said I think or I knew, no, that is improper. I cannot do that. You, the jury, are the judges of credibility. And the fact that the prosecutor delivered that lengthy apology undercuts any argument that the misconduct was intentional. I guess another possibility with Case would be that he had told the defendant or the defendant's lawyer he was going to say one thing and then he said another, that he went south on him when he got on the stand. I don't believe the evidence there set out, Your Honor. I believe the defense theory was this case, the defendant has been framed by all these bad people. Could you tell me more about the holes, what the holes looked like? Yes, Your Honor. There were six holes. I don't mean the evidence where one of these methods says he saw the defendant doing it. I mean the evidence from somebody that's not one of the methods saying what the holes looked like. Your Honor, there was an expert who testified in the government's case that said he observed the bottom of the vessel and there appeared to be six small holes that were consistent with being made by a pick and that that evidence suggested in this expert's opinion that it had to have been scuttled intentionally. But, Your Honors, it was not a disputed trial as to whether or not the vessel was in fact scuttled intentionally or unintentionally. The only issue was who had done it. On the pick theory, I know of two kinds of picks. One is the kind you swing like on a pickaxe. That would make a jagged hole where the pieces go out instead of in as they would be if a rock broke the hole. And the other kind is a pick that you use to punch a hole preparatory to putting a nail or screw in. You just tap on it and it makes a nice neat hole. Did evidence come out about what the hole looked like? There was evidence about a hole. My recollection is that the evidence suggested it was consistent with being made. It seemed like a large bar based upon the witness's testimony. The Willingham testified that he observed the defendant using a bar. No, no, no. A bar. You're not understanding my question. Yes, Your Honor. I'm not asking about what the meth heads say they saw. I'm asking about what the Coast Guard and the pollution agent said the holes looked like. Your Honor, they said that there were six holes that looked consistent with being intentionally scuttled. Did they describe the holes any more concretely? They said they were small, that I recall. Round, jagged, wood going out, wood going in, fiberglass going out, fiberglass going in. Well, I don't believe it would have been fiberglass because I believe it was mahogany bottomed hole. It's an old crisscross. Yes, Your Honor. It was Ronald Warren was the commercial diver who testified on behalf of the government. And he stated that it was without a doubt that the vessel was intentionally sunk and that it was, in his opinion, the six holes had been formed by a metal pick or bar punching through the bottom. Okay. So really all that was left was whether this was a conspiracy to frame Bactell for sinking his boat or whether Bactell sunk his boat. Yes, Your Honor. And the evidence did not bear out the defendant's theory that a number of witnesses, it shifted between the opening and the closing as to who the specific witnesses were who had framed the defendant. But the theory had been that the defendant had evicted these witnesses from the marina, and therefore the witnesses were retaliating against him. Counsel, ordinarily when we're looking at these cases where there's conceded misconduct, we look at whether the evidence was overwhelming. Now here the jury came back once saying that they were possibly deadlocked. That's rather inconsistent with the theory of overwhelming evidence. That's one kind of sticking point for me in this case. I have two responses to that, Your Honor. The first is that the district court who observed all the evidence and heard the witnesses concluded that the evidence was overwhelming. Secondly, the letter, the note came out early on in the deliberations. This was an eight-day-long trial, and after four hours of deliberation, the jury returned a note. That was at 11 a.m. At 1.50 p.m. that same day, the jury returned a verdict of guilty on all counts. Well, how did the judge respond to their coming back in and saying we've got a possible deadlock here? Your Honor, the judge responded that they had not been deliberating very long. And although I don't have the record in front of me that they should go back, that he did not deliver an Allen charge. He just sent them back. Yes, Your Honor. Thank you, counsel. Thank you, Your Honor. I just have one point to make regarding whether or not it was overwhelming in this case, and it's something that was somewhat raised by a government counsel, and that is the issue of Mr. Borkowski, who, if you believe these witnesses, was involved just as much as Mr. Boktel in this scuttling. And if you believe the witnesses' statements that they gave before trial, a man named Bill Saunders, the dockmaster, was also involved in this, consistent with Mr. Boktel's theory that these people had a grudge against the people at the marina and were out to get them. And yet, Mr. Boktel was the only one that was tried. And I think that despite what the government says now about their case being overwhelming, they had real problems with these witnesses. They didn't call a case. They recognized they had a few really bad witnesses who are the worst, the best of the two, will put them on and try to make the case against Mr. Boktel. So despite what they're saying now, their actions up to this point regarding the other potential targets and how they presented their case indicate they don't think their case is that strong. That's not unusual to try to try the person you feel you have the strongest case against as a prosecutor. That doesn't signify that the case was – I mean, the jury convicted them, so I don't understand your point. The fact that they didn't try the other people is not startling to me. Well, the point is that these witnesses, particularly Willingham and Case, implicate Perkowski just as much as they implicate Boktel. And if the government truly – and as I said before, I think, despite all the other evidence rests on whether these witnesses can be believed. And if the government truly believed these witnesses are telling the truth, these witnesses are reliable, these witnesses can win our case, Perkowski should have been the co-defendant. The fact that they didn't do that and went with Mr. Boktel, who it's immediately easier to go after because it was, in fact, his vote, so he has a connection to it. Was there any dispute about whether it was a worthless boat? There was some. The person who actually was responsible for bringing the boat up described it as being in fair condition, but other people described it as being dilapidated. And the truth was even Mr. Boktel said he was moving off the boat because it was taking on water and it wasn't really habitable. So Boktel said it was not habitable? For him, yes. It was his habitation. He moved to a new boat? Yes, he moved to a new boat. But not habitable for him for the conditions he needed, but it was not worthless in the sense that somebody may have paid $100 to use it for scrap or for whatever. Thank you. Thank you very much. Thank you, counsel. U.S. v. Boktel is submitted.
judges: Fletcher, Kleinfeld, Rawlinson